# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 0:22-CV-61828

VANGUARD PLASTIC SURGERY, PLLC,
d/b/a VANGUARD AESTHETIC AND
PLASTIC SURGERY, a Florida professional
limited liability company,

      Plaintiff,

vs.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY, a foreign corporation,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Vanguard Plastic Surgery, PLLC, d/b/a Vanguard Aesthetic & Plastic Surgery ("Plaintiff"), sues Defendant, Cigna Health and Life Insurance Company ("Defendant"), and alleges as follows:

### NATURE OF ACTION

1.    This action arises under Florida state law in connection with Defendant's failure to pay all amounts due and owing to Plaintiff for medical services rendered to patient, S.S. ("Patient"), who was at all material times a member of a group health insurance policy issued and/or administered by Defendant (the "Policy").

2.    Plaintiff provided medically necessary services to Patient consisting of two extensive, complex surgical procedures relating to a traumatic boating accident in which the boat on which Patient was travelling exploded, causing Patient to suffer significant injuries, including traumatic amputations of her extremities, and develop associated complications, including renal

failure and rhabdomyolysis (a medical condition that can be fatal or result in permanent disability).

3.      Due to Patient requiring guillotine amputations for her traumatic injuries and significant treatment as a result of Patient being grossly unhealthy given the nature of Patient's injuries at the time Patient presented to Broward Health Medical Center ("BHMC"), Patient required multiple surgical interventions by multiple different specialists to relieve or eliminate the conditions for which Patient first presented for treatment and/or those that developed during the course of Patient's treatment

4.      The surgical procedures Plaintiff's specialists performed on Patient included: (1) extensive excisional debridement on Patient's right and left legs, removal of unhealthy medical gastroc muscle on Patient's left leg, and readvancement of the gastroc muscles and application of VAC dressings on both the right and left legs; and (2) extensive excisional debridement, advancement and rotation of muscles and muscles flaps, and split-thickness skin grafting on Patient's right leg, left leg, and left arm; local tissue rearrangement and application of VAC dressings on Patient's right and left legs; and other related procedures (collectively, the "Surgeries").

5.      Plaintiff is not attempting to stand in the shoes of Patient and does not seek to enforce any rights under any health insurance policy issued, operated, and/or administered by Defendant. Rather, Plaintiff is asserting independent claims under Florida state law: (a) for breach of an express written contract (i.e., the TRPN Agreement, as defined below), pursuant to which Defendant agreed to pay Plaintiff directly for such services at a discounted rate (i.e., the TRPN Network Savings Rate, as defined below); and (b) in the alternative, for promissory estoppel, breach of implied-in-fact contracts, and unjust enrichment, pursuant to which Defendant is obligated to reimburse Plaintiff for the reasonable fair market value of such services.

**PARTIES**

6.     Plaintiff is a Florida professional limited liability company with its principal place of business located in Broward County, Florida, and is *sui juris* in all respects.

7.     Upon information and belief, Defendant is a foreign for-profit corporation with its principal place of business located in Bloomfield, Connecticut, and is *sui juris* in all respects.

**JURISDICTION AND VENUE**

8.      This Court possesses original jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (a) a substantial part of the events or omissions giving rise to this action occurred in this jurisdiction, the subject medical procedures were provided in this jurisdiction, and Defendant's underpayment of the associated claims unfolded in this jurisdiction, and (b) this Court has personal jurisdiction due to Defendant's minimum contacts in this forum.

**GENERAL ALLEGATIONS**

10.     Plaintiff, through its physicians, provides medical services, including emergency services and care, reconstruction services, and other surgical services, to patients in Broward County, Florida, including at BHMC.

11.     Plaintiff's physicians are licensed medical doctors practicing in the State of Florida.

12.     Plaintiff's physicians are board-certified plastic surgeons who perform skin grafts, flap procedures, microsurgeries, and other surgical services that allow for complex repair of human tissue after trauma, cancer, or congenital defects.

13.     Upon information and belief, Plaintiff's physicians, who are fellowship-trained and who specialize in microsurgery, are the only plastic surgeons at BHMC with those qualifications.

14.     At all material times, Defendant was authorized to and engaged in the business of selling insurance, administering insurance, and/or deciding and paying insurance claims (i.e., claim administration) throughout the State of Florida, including Broward County, Florida.

15.     Upon information and belief, at all material times, Defendant was the claims administrator of the Policy, responsible for administering and/or paying claims for medical services provided to Patient.

16.     At all material times, Defendant collected premiums, fees, and/or other forms of compensation in return for agreeing to properly reimburse providers (like and including Plaintiff) that render medical services to Patient and Defendant's other members.

17.     In exchange for premiums, fees, and/or other forms of compensation, Defendant is obligated to pay for the covered medical services received by Patient and Defendant's other members.

18.     Upon information and belief, BHMC is and was at all material times "in-network" with Defendant.

19.     Managed care organizations, like and including Defendant, are required to maintain an adequate number and type of providers within their networks to ensure that their members have access to and receive medically necessary without unreasonable delay or burden.

20.     To ensure that Patient and Defendant's other members can access and receive medical care without unreasonable delay or burden, Defendant: (a) maintains a network of healthcare providers and medical facilities that provide medical services to Defendant's members (commonly referred to as "in-network" medical providers/medical facilities); and (b) has entered into separate contractual relationships with medical providers that were not "in-network" with Defendant—especially those "out-of-network" providers (like and including Plaintiff) that provide

complex medically necessary treatments at "in-network" facilities (like and including BHMC) — through supplemental "shared savings" networks (like and including the Three Rivers Provider Network).

*The TRPN Network Savings Agreement and the Parties' Course of Dealings*

21.     At all material times, Plaintiff was a provider in network savings programs (i.e., shared savings networks), including the Three Rivers Provider Network ("TRPN").[1]

22.     On or about July 1, 2015, Plaintiff and Defendant, through Defendant's duly authorized agent, TRPN, entered into a contract setting forth Plaintiff's and Defendant's rights and obligations relating to the parties' participation in TRPN (the "Network Savings Agreement").

23.     The Network Savings Agreement provides that "TRPN contracts with insurance companies, third party administrators, health plans, individuals and entities that directly or indirectly access TRPN contracted providers for covered services," which it refers to as "Clients" (each, a "TRPN Client").

24.     TRPN disclosed and otherwise provided Plaintiff with a list of all TRPN Clients (the "Payer List") that agreed to participate in TRPN and/or subject themselves to the terms of the Network Savings Agreement.

25.     At all material times, Defendant was specifically identified in the Payer List as being a TRPN Client that had: (a) contracted with TRPN for the purpose of directly or indirectly accessing Plaintiff to provide "covered services" to Patient and Defendant's other members; (b) retained TRPN as Defendant's billing intermediary to negotiate a reasonable reimbursement rate for all medically necessary services provided by Plaintiff; (c) expressly agreed to participate in

---

[1] These are also referred to as "rental networks," "medical discount networks," "repricing agreements," and various other names.

TRPN; and/or (d) agreed to be subject to and otherwise bound by the terms of the Network Savings Agreement.

26.     At all material times, Defendant, through TRPN: (a) procured discounted rates from Plaintiff on Defendant's behalf; (b) obtained the right for Defendant the right to access Plaintiff at a negotiated, discounted rate of reimbursement for all medically necessary services Plaintiff provided to Patient; (c) allowed Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (d) allowed Patient to avoid being subject to balance billing for the services that Plaintiff provided to Patient.

27.     Moreover, TRPN advertises and otherwise represents that it is "a billing intermediary tasked with negotiating a reasonable reimbursement rate between the payer and the provider, all while protecting the patient from balance billing." *See* https://trpnppo.com (last visited Sept. 26, 2022).

28.     TRPN also represents that it "partners" with TRPN Clients (like and including Defendant) on its website. *See* https://trpnppo.com/about-us (last visited Sept. 26, 2022) ("Contact TRPN and let us demonstrate to you how we will partner with your company and bridge the administrative gap between Healthcare Payers and Providers. You will get access to the largest, most comprehensive provider network in the nation.") (emphasis added).

29.     Accordingly, TRPN was an agent for Defendant and entered into the Network Savings Agreement on Defendant's behalf and with Defendant's authority.

30.     At all material times, Plaintiff reasonably believed that TRPN had authority to act as Defendant's agent in negotiating and entering into the Network Savings Agreement on behalf of Defendant.

31.     TRPN notified Plaintiff that, at all material times, Defendant was and is a disclosed

principal to the Network Savings Agreement. Additionally, or in the alternative, the disclosure of Defendant as a "TRPN Client" subject to the Network Savings Agreement expressed an intent by the parties to the Network Savings Agreement that said contract would confer a primary and direct benefit upon Defendant.

32.     Pursuant to its participation in TRPN and/or Network Savings Agreement, each TRPN Client (like and including Defendant) agreed to pay certain "out-of-network" medical providers (like and including Plaintiff) for any "covered services" provided to members enrolled under an insurance policy issued and/or administered by said TRPN Client (like and including Patient) at a seven percent (7%) discount for all billed charges, less any applicable patient responsibility amounts such as co-payments, co-insurance, or deductibles (the "TRPN Network Savings Rate").

33.     Pursuant to TRPN, the term "covered services" includes all services that are medically necessary.

34.     Through TRPN, Defendant inured a direct benefit by securing discounted rates from Plaintiff and other providers for medical services provided to Patient and its other members.

35.     In exchange, Plaintiff agreed not to balance bill any members enrolled under an insurance policy issued and/or administered by said TRPN Client (like and including Patient).

36.     Accordingly, Defendant agreed to pay (and Plaintiff agreed to accept payment) for any medically necessary services that Plaintiff provided to Patient at the TRPN Network Savings Rate.

37.     In other words, Defendant agreed to pay Plaintiff 93% of all billed charges for all medically necessary services provided to Patient, including the Surgeries.

38.     Subsequently, Plaintiff and Defendant established a course of dealings whereby: (a)

Defendant reimbursed Plaintiff at the TRPN Network Savings Rate for medically necessary services that Plaintiff provided to other of Defendant's members similar to the services Plaintiff provided to Patient in this case; and/or (b) Defendant attempted to negotiate an even lower reduced reimbursement amount based on the fair market or reasonable value of such services.

39.     Further, Patient's member ID card, issued by Defendant, indicates that Defendant recognizes network savings programs, like TRPN, for services provided to Patient.

40.     As such, Plaintiff performed the Surgeries with the understanding and expectation that Defendant would reimburse Plaintiff for the Surgeries at rates equal to the TRPN Network Savings Rate or, at a minimum, at the reasonable, fair market value for such services.

41.     Defendant therefore agreed and is obligated to reimburse Plaintiff for the Claims at 93% of the billed charges (i.e., the TRPN Network Savings Rate) pursuant to the Network Savings Agreement and/or the parties' participation in TRPN. Alternatively, Defendant is obligated to pay Plaintiff under the parties' implied contracts and the doctrine of quantum meruit the reasonable fair market value of the services rendered.

42.     Instead, as alleged further below, Defendant improperly failed to pay Plaintiff at either the TRPN Network Savings Rate or the reasonable fair market value for the services provided as part of the Surgeries.

<u>*Initial Emergency Evaluation and Treatment*</u>

43.     In or around July 2018, Patient was involved in traumatic boat accident while in the Bahamas, in which the boat on which Patient was travelling exploded and caused Patient to suffer significant injuries, including the partial traumatic amputation of her extremities and associated complications, including renal failure and rhabdomyolysis (i.e., a breakdown of muscle tissue that releases damaging proteins and electrolytes into the blood).

44.    Patient was transported to BHMC, located in Fort Lauderdale, Florida, where Patient presented to the BHMC emergency department with post double leg amputations, rhabdomyolysis, and renal failure, which conditions manifested themselves by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably have been expected to result in serious jeopardy to Patient's health, serious impairment to Patient's bodily functions, and/or serious dysfunction of Patient's bodily organ(s) or part(s).

45.    Plaintiff's physician was contacted as the on-call surgeon for care at BHMC after Patient first presented to the BHMC emergency department.

46.    At that time, Plaintiff's physician, in conjunction with other treating physicians at BHMC, determined that Patient suffered from emergency medical conditions, and that Patient required immediate medical attention to treat those conditions.

47.    Accordingly, Patient was admitted to the intensive care unit at BHMC through the emergency department for additional intervention and treatment.

48.    Upon information and belief, with full knowledge of the circumstances, Defendant: (i) approved of Patient's admission to BHMC in or around July 2018 for the treatment of Patient's medical conditions; (ii) approved of the provision of medical services to Patient by providers like Plaintiff during said hospital admission; and (c) agreed to pay Plaintiff the fair market value for such services.

49.    As a result of Patient's traumatic injuries, Patient underwent guillotine amputations of both legs, and attempts were made to treat Patient's other associated conditions as necessary before any attempt could be made for Patient's wound closures, which services were performed on an emergency or urgent basis but in a staged fashion.

### *July 12, 2018 Surgery ("First Surgery")*

50.     On or about July 12, 2018, Plaintiff, through its physicians, provided medically necessary services to Patient at BHMC, which services consisted of a complex surgery that was necessary to relieve or eliminate the medical conditions for which Patient initially sought treatment at BHMC and/or those that developed subsequent to Patient's admission to BHMC, including: (a) excisional debridement through the skin, tissue, and bone, removal of unhealthy medial gastroc muscle, and readvancement of gastroc muscle flap for coverage of Patient's distal tibia on Patient's left leg; (b) excisional debridement through the skin and subcutaneous tissue with a lateral gastroc advancement flap for attempted coverage of Patient's open tibia on Patient's right leg; (c) application of VAC dressings bilaterally; and (d) other related procedures (the "First Surgery").

### *July 16, 2018 Surgery ("Second Surgery")*

51.     After the First Surgery, Patient's condition remained unstable due in part to the severe nature of Patient's traumatic injuries and associated complications; Patient continued to suffer from, among other things, an open fasciotomy wound of the left arm and complex wounds of the right and left leg, including exposed neurovascular bundles and necrotic muscle; and Patient remained sedated due to the severity and nature of Patient's injuries, which conditions manifested themselves by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably have been expected to result in serious jeopardy to Patient's health, serious impairment to Patient's bodily functions, and/or serious dysfunction of Patient's bodily organ(s) or part(s).

52.     Accordingly, on or about July 16, 2018, Patient was returned to the operating room at BHMC on an emergency or urgent basis to address the conditions that developed and/or persisted subsequent to the First Surgery.

53.     On or about July 16, 2018, Plaintiff, through its physicians, provided medically necessary services to Patient at BHMC, which services consisted of a complex surgery that was necessary to relieve or eliminate the medical conditions for which Patient initially sought treatment at BHMC and/or those that developed subsequent to Patient's admission to BHMC, including: (a) posterior incision detachment and advancement of medial and lateral gastroc muscles, local tissue rearrangement measuring 15 cm x 20 cm with complete circumferential soft tissue stripping, advancement of posterior portion of Patient's calf, excisional debridement through the skin and subcutaneous tissue down to the bone, split thickness skin grafting measuring 15 cm x 15 cm, and application of a VAC dressing on Patient's right leg; (b) excisional debridement through the skin, subcutaneous tissue, fascia, and muscle, medial gastroc rotation, local tissue rearrangement of the medial leg with a rhomboid flap measuring 8 cm x 5 cm, split thickness skin grafting measuring 15 cm x 20 cm, and application of a VAC dressing on Patient's left leg; (c) excisional debridement through the skin, subcutaneous tissue, and muscle, rotation of muscle flap for coverage of Patient's ulnar fracture, and split-thickness skin grafting of Patient's left arm; and (d) other related procedures (the "Second Surgery," and together with the First Surgery, the "Surgeries").

### *Defendant's Underpayment of the Claims*

54.     Plaintiff submitted claims for reimbursement to Defendant for the services Plaintiff provided to Patient as part of the Surgeries (collectively, the "Claims").

55.     Plaintiff's charges for the medically necessary services it provided as part of the First Surgery totaled $85,261.00. Defendant paid only $2,465.28 to Plaintiff for those services.

56.     Plaintiff's charges for the medically necessary services it provided as part of the Second Surgery totaled $159,829.00. Defendant paid only $4,552.95 to Plaintiff for those services.

57.     Accordingly, Plaintiff's total charges for the services underlying the Claims total

$245,090.00.

58.     To date, Defendant has paid Plaintiff a total of $7,018.23 on the Claims, representing only 2.9% of Plaintiff's total charges for the services at issue.

59.     In connection with such payments, Defendant issued remittance notices to Plaintiff in Fort Lauderdale, Florida, and made the foregoing payments to Plaintiff through interstate wire.

60.     In those remittance notices, Defendant included remarks such as: "Health care professional: patient is not liable for this additional amount if you accept the established reimbursement schedule allowed amount shown. Call Zelis…before billing the patient more than the amount shown as patient liability."

61.     Upon information and belief, Zelis Healthcare, Inc. ("Zelis") is a repricing company that provides supplemental networks to payers like Defendant, and Zelis is Defendant's agent duly authorized to negotiate and/or otherwise determine payment amounts due to out-of-network providers (like Plaintiff) when Defendant initially underpays claim submitted by those providers.

62.     Notwithstanding the terms of the Network Savings Agreement, Defendant, through companies like Zelis, attempts to coerce out-of-network providers (like Plaintiff) to accept drastic underpayments on their claims and to waive any further rights to seek additional payment, so that Zelis and/or Defendant can "skim" a percentage of the "savings" on such claims to retain for themselves, thus obtaining a direct benefit from the entire transaction.

63.     In or around October 2018, Defendant advised Plaintiff that the Claims were "enhanced" to an "in-network" level because Patient was admitted through the BHMC emergency department and the Surgeries were performed on an urgent or emergency basis, and Defendant directed Plaintiff to contact Zelis concerning payment on the Claims.

64.     At Defendant's request, Plaintiff contacted Zelis in or around November 2018, at which time Zelis also informed Plaintiff that the Claims would be "enhanced" to an in-network level by Defendant.

65.     By utilizing Zelis to administer the Claims, Defendant implicitly acknowledged it was appropriate to look outside the Policy in administering those Claims, either through TRPN, the "enhancement" of Plaintiff to an in-network level, or otherwise.

66.     Notwithstanding Defendant's and Zelis's representations, no "enhancement" was made on the Claims.

67.     Defendant further included remarks on the remittance documents for the Claims with directions for Patient to "call [Defendant] if billed more than the 'what I owe' amount" by Plaintiff. The only basis for this representation would be an agreement between Plaintiff and Defendant pursuant to which Plaintiff agreed not to balance bill Patient, as there is no other agreement limiting Plaintiff's ability to balance bill the Patient.

68.     Indeed, after Defendant's initial underpayment on the Claims, Defendant advised Plaintiff's representatives that Defendant would agree to reprocess the Claims correctly and on an expedited basis if Plaintiff provided a "patient statement" indicating what Patient's responsibility would have been if Patient were balance billed on the Claims.

69.     In turn, Plaintiff provided Defendant with said "patient statement" indicating that Patient would be responsible for over $238,000.00 as a balance bill on the Claims if Plaintiff were to balance bill Patient; however, Defendant still refused to reprocess the Claims correctly.

70.     Plaintiff performed the Surgeries, and submitted the Claims, with the understanding and expectation that Defendant would reimburse Plaintiff for the services provided to Patient at the TRPN Network Savings Rate or, in the alternative, at the reasonable fair market value of such

services.

71.    Plaintiff's understanding and expectation in this regard was based upon, among other things: (a) negotiations regarding the proposed terms of the Network Savings Agreement; (b) Defendant's promise (through its authorized agent, TRPN) to reimburse Plaintiff for "covered services" (i.e., medical necessary services) that it provides to Patient and other of Defendant's members at the TRPN Network Savings Rate; (c) Defendant's course of dealings with Plaintiff, whereby Defendant agreed to and in fact did reimburse Plaintiff at the TRPN Network Savings Rate or, alternatively, at the fair market or reasonable value, for similar services provided to Defendant's other members; (d) Defendant's obligation to ensure that Patient and Defendant's other members could access and receive medically necessary care from providers without unreasonable delay or burden; (e) representations by Defendant (directly and/or through its agent, Zelis) that Defendant would "enhance" the Claims to an in-network level; ) (f) verbiage contained in the remittance notices issued by Defendant to Plaintiff in connection with processing the Claims that directed Patient not to balance bill Patient; (f) verbiage contained in the remittance notices issued by Defendant to Patient advising Patient to contact Defendant if Patient was balance billed on the Claims; and/or (g) Defendant's adjudication of the Claims, which determined that the services underlying the Claims were "covered services" (i.e., medically necessary).

72.    At all material times, Defendant was and is aware that Plaintiff provided medical services to Patient and billed Defendant for same with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting the TRPN Network Savings Rate applicable to the services provided to Patient, or alternatively, at rates reflecting the fair market or reasonable value of such services.

73.    Defendant ultimately adjudicated the Claims and determined that the services

underlying the Claims were covered (i.e., medically necessary) services.

74.     After adjudicating the Claims, Defendant provided coverage and paid for the Claims, albeit at rates: (a) below Plaintiff's billed charges; (b) below the TRPN Network Savings Rate; (c) below "enhanced" in-network levels; and/or and (d) below the reasonable fair market value for the services underlying the Claims.

75.     The rates at which Defendant paid Plaintiff are less than the rates Plaintiff received during the same time period from other, similar managed care organizations for similar services provided in the same community.

76.     The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$238,071.77**.

77.     All necessary conditions precedent to Plaintiff bringing this action have occurred or were performed, excused, and/or waived.

### COUNT I
### Breach of Express Contract – Network Savings Agreement
*Alternative to Remaining Counts*

78.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 77 above.

79.     This is an action for monetary damages against Defendant for its breach of the Network Savings Agreement.

80.     As set forth in detail above, with full knowledge and intent, the parties duly negotiated and entered into the Network Savings Agreement.

81.     Pursuant to the Network Savings Agreement, Defendant promised and was, at all material times, contractually obligated to reimburse Plaintiff for the medical services that it provided to Patient as part of the Surgeries at the TRPN Network Savings Rate (i.e., 93% of Plaintiff's billed charges).

82.     Plaintiff did, in fact, provide medically necessary services to Patient as part of the Surgeries and submitted the Claims to Defendant with the understanding and expectation that Defendant would reimburse Plaintiff for such services at the TRPN Network Savings Rate.

83.     Plaintiff fully performed in accordance with the terms of the Network Savings Agreement.

84.     As set forth in detail above, however, Defendant materially breached the Network Savings Agreement by failing and/or refusing to fully pay Plaintiff for all services that Plaintiff provided as part of the Surgeries at the TRPN Network Savings Rate.

85.     Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

86.     As a direct and proximate result of Defendant's breach of the Network Savings Agreement, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff for all direct, incidental, and consequential damages; costs; all applicable interest; and for such other and further relief that this Court may deem just and proper.

### COUNT II
### Breach of Implied-in-Fact Contract – Network Savings Agreement
*Alternative to Remaining Counts*

87.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 21, 24 through 28, and 32 through 77 above.

88.     This Count II is plead in the alternative to all remaining counts.

89.     At all material times, Defendant defined "participating providers" to include both "in-network" providers with which Defendant has a direct contractual relationships and providers that are "out-of-network" with Defendant but with which Defendant has an indirect contractual

relationship, i.e., providers who participate in network savings programs like and including TRPN.

90.     At all material times, Plaintiff was a provider in the TRPN network savings program, and Defendant was a TRPN Client. Defendant therefore recognized Plaintiff as a "participating provider."

91.     As described in detail above, Plaintiff has conferred a direct benefit on Defendant by, among other things: (a) providing Defendant with access to "out-of-network" medical services provided by Plaintiff at a discounted rate, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is legally obligated to provide coverage and pay; (c) agreeing to provide discounted rates for services provided to Patient, thereby reducing the amount of Defendant's financial liability for those services; (d) allowing Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (e) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient.

92.     Defendant approved of Patient's admission to BHMC and approved of the provision of medical services to Patient by providers like Plaintiff as detailed above.

93.     At the time Defendant approved of the provision of medical services to Patient by providers like Plaintiff, Defendant knew or should have known that Plaintiff was a contracted provider with TRPN and that the Network Savings Agreement requires payment at 93% of Plaintiff's billed charges.

94.     As described above, Defendant tacitly promised to pay Plaintiff for the Surgeries at

the TRPN Network Savings Rates by, among other things: (a) defining "participating providers" to include providers who participate in network savings program like TRPN; (b) contracting with TRPN to be a TRPN Client; (c) permitting itself to be listed as a TRPN Client on the TRPN Payer List; (d) issuing a member ID card to Patient stating that it recognized network savings programs like TRPN for services rendered to Patient; (e) approving of Patient's admission to BHMC and the provision of medical services to Patient by providers like Plaintiff during that admission; and/or (f) paying Plaintiff for services provided to other members of Defendant at the TRPN Network Savings Rates.

95.     In exchange, Plaintiff agreed to: (a) accept discounted rates for all medically necessary services that it provides to Patient (and Defendant's other members); and/or (b) not balance bill Patient (and/or other members enrolled under an insurance policy issued and/or administered by Defendant).

96.     Defendant in fact recognized the existence of the parties' implied-in-fact contract by directing Plaintiff not to balance bill the Patient and by advising Patient to contact Defendant if Patient was balance billed.

97.     Moreover, the course of dealing between the parties was such that Defendant often paid Plaintiff at the TRPN Network Savings Rate for similar services that Plaintiff provided to Defendant's other Policy members, thereby establishing a common basis of understanding between the parties that Defendant would pay Plaintiff for the Surgeries at issue in this case at the TRPN Network Savings Rate.

98.     Defendant therefore knew or should have known that Plaintiff was conferring the above benefits with the expectation that it would be reimbursed by Defendant for same at the TRPN Network Savings Rate or the reasonable/fair market value of same.

99.     Plaintiff fully performed its obligations under the parties' contract by performing the Surgeries and by not balance billing Patient on the Claims.

100.    As set forth in detail above, however, Defendant materially breached the parties' agreement by failing and/or refusing to fully pay Plaintiff for all services that Plaintiff provided as part of the Surgeries at the TRPN Network Savings Rate.

101.    Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

102.    As a direct and proximate result of Defendant's breach of the parties' implied-in-fact contract (i.e., Defendant's tacit promise to pay Plaintiff at the TRPN Network Savings Rate), Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Surgeries and the TRPN Network Savings Rate, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT III
## <u>Promissory Estoppel</u>
### *Alternative to Remaining Counts*

103.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 21, 24 through 28, and 32 through 77 above.

104.    This Count III is pled in the alternative to all remaining counts.

105.    As described in detail above, Defendant (directly and/or through its authorized agent, TRPN) promised to pay Plaintiff for any medically necessary services (like and including the Surgeries) that Plaintiff provided to Defendant's members (like and including Patient) at the TRPN Network Savings Rate.

106.     Defendant further promised to pay Plaintiff at the TRPN Network Savings Rate by issuing a member ID card to Plaintiff representing that Defendant recognizes network savings programs, like TRPN, for services provided to Patient.

107.     At all material times, Defendant knew (or had reason to know) that Plaintiff was reasonably relying upon Defendant's promise in that regard by providing medical services to Defendant's members with the reasonable expectation and understanding that it would be reimbursed by Defendant at the TRPN Network Savings Rate.

108.     Plaintiff did, in fact, reasonably rely on Defendant's promise to reimburse Plaintiff at the TRPN Network Savings Rate by, among other things, agreeing to provide services to Patient as part of the Surgeries, to its detriment.

109.     By preauthorizing the Surgeries and related admissions to BHMC, Defendant knew and approved of Plaintiff providing medical services to Patient as part of the Surgeries.

110.     Based upon Defendant's representations and Plaintiff's reasonable reliance on those representations, Defendant is estopped from repudiating and/or denying the terms of the agreement described above.

111.     Defendant knew or should have known that Plaintiff would reasonably rely upon Defendant's promise to reimburse Plaintiff at the TRPN Network Savings Rate for the services it provided to Patient as part of the Surgeries.

112.     Defendant failed to reimburse Plaintiff at the promised TRPN Network Savings Rate for the services that Plaintiff provided as part of the Surgeries.

113.     As a result of Defendant refusing to reimburse Plaintiff for the Surgeries at the TRPN Network Savings Rate, Plaintiff has suffered injury and is entitled to monetary damages from Defendant.

114.    Under the circumstances set forth above, it is unjust and inequitable for Defendant to refuse to honor its promise to pay Plaintiff for the Surgeries at the TRPN Network Savings Rate.

115.    Injustice can be avoided only by enforcement of Defendant's promise to pay Plaintiff at the TRPN Network Savings Rate through the doctrines of promissory estoppel.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Surgeries and the TRPN Network Savings Rate, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

**COUNT IV**
**Breach of Implied-in-Fact Contract – Fair Market Value**
*Alternative to Remaining Counts*

116.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 21, 26, 38, and 40 through 77 above.

117.    This Count IV is pled in the alternative to all remaining counts.

118.    As described in detail above, Plaintiff has conferred a direct benefit on Defendant by: (a) providing Defendant with access to "out-of-network" medical services provided by Plaintiff at a discounted rate, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is legally obligated to provide coverage and pay; (c) agreeing to provide discounted rates for services provided to Patient, thereby reducing the amount of Defendant's financial liability for those services; (d) allowing Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (e) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints

by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient.

119.    Upon information and belief, Defendant: (a) approved of Patient's admission into BHMC for the treatment of Patient's medical conditions; (b) approved of the provision of medical services to Patient by providers like and including Plaintiff during that admission; and (c) tacitly agreed to pay Plaintiff the reasonable value for the services rendered to Patient as part of the Surgeries.

120.    In exchange, Plaintiff agreed to perform the Surgeries on Patient and not to balance bill Patient for the Surgeries.

121.    Defendant in fact recognized the existence of the parties' implied-in-fact contract by directing Plaintiff not to balance bill the Patient, by advising Patient to contact Defendant if Patient was balance billed, and by agreeing the "enhance" payment on the Claims.

122.    Defendant further acknowledged its obligation and responsibility for payment and its approval of Plaintiff's performing medical services as part of the Surgeries by paying the Claims for those services and/or issuing remittance notices to Plaintiff reflecting allowed amounts for those services, albeit at rates far below that to which Plaintiff is entitled.

123.    Moreover, the course of dealing between the parties was such that Defendant often paid Plaintiff at the fair market or reasonable value for similar services that Plaintiff provided to Defendant's other Policy members, thereby establishing a common basis of understanding between the parties that Defendant would pay Plaintiff for the Surgeries at issue in this case at the fair market or reasonable value of same.

124.    Defendant therefore knew or should have known that Plaintiff was conferring the above benefits with the expectation that it would be reimbursed by Defendant for same at the fair market or reasonable value of same.

125.    Plaintiff fully performed its obligations under the parties' implied-in-fact contract by performing the Surgeries and by not balance billing Patient for the Surgeries.

126.    As set forth above, however, Defendant materially breached the parties' agreement by failing and/or refusing to pay Plaintiff the fair market or reasonable value for all services that Plaintiff provided as part of the Surgeries.

127.    Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

128.    As a direct and proximate result of Defendant's breach of the parties' implied-in-fact contract (i.e., Defendant's tacit promise to pay Plaintiff at the fair market or reasonable value), Plaintiff has been damaged.

129.    The circumstances are such that it would be inequitable for Defendant to retain the aforementioned benefits without paying fair value for same.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the claims at issue and the fair market or reasonable value of the medical services underlying those claims, as determined by the finder of fact, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

### COUNT V
### <u>UNJUST ENRICHMENT</u>
*Alternative to Remaining Counts*

130.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 21, 26, 34, 38, and 40 through 77 above.

131.    This Count V is pled in the alternative to all remaining counts.

132.     Under  established  Florida  precedent,  Plaintiff  conferred  a  direct  benefit  on Defendant  by  providing  valuable  medical  services  to  Patient  as  part  of  the  Surgeries,  with  the knowledge  and/or  approval  of  Defendant.  *See Merkle v. Health Options, Inc.*,  940  So.  2d  1190, 1199  (Fla.  4th  DCA  2006),  *rev. denied*,  962  So.  2d  336  (Fla.  2007);  *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*,  899  So.  2d  1222,  1228  (Fla.  1st  DCA  2005).

133.     More  particularly,  as  described  in  detail  above,  Plaintiff  has  conferred  a  direct benefit  on  Defendant  by:  (a)  providing  Defendant  with  access  to  "out-of-network"  medical services  provided  by  Plaintiff  at  a  discounted  rate,  thereby  making  Defendant  a  more  attractive option  to  potential  customers  by  enhancing  Defendant's  networks;  (b)  ensuring  that  Patient  (and Defendant's  other  members)  have  prompt  and  reasonable  access  to  "out-of-network"  medical providers  like  Plaintiff  for  which  Defendant  is  legally  obligated  to  provide  coverage  and  pay;  (c) agreeing  to  provide  discounted  rates  for  services  provided  to  Patient,  thereby  reducing  the  amount of  Defendant's  financial  liability  for  those  services;  (d)  allowing  Defendant  to  meet  its  statutory obligations  to  provide  coverage  for  emergency  medical  services;  (e)  allowing  Patient  to  avoid being  subject  to  balance  billing  for  the  services  provided  as  part  of  the  Surgeries,  thereby eliminating  complaints  by  Patient  that  would  have  occurred  had  Plaintiff  instead  sought  the balance  of  its  bill  from  Patient;  and/or  (f)  providing  said  benefits  through  an  intermediary  third party  (i.e.,  TRPN).

134.     Plaintiff's  provision  of  covered  of  such  medical  services  to  Patient  further benefitted  Defendant  because  it  offered  a  more  permanent  and/or  more  beneficial  solution  to  the medical  conditions  for  which  Patient  initially  sought  treatment  on  the  dates  set  forth  above, negating  Patient's  need  to  seek  additional  medical  treatment  in  the  future  for  which  Defendant would  be  financially  liable.  In  other  words,  by  minimizing  (if  not  entirely  eliminating)  Patient's

future medical expenses, and thus medical claims to Defendant, including expenses and claims for prolonged alternative treatments or additional medical services or complications arising from an inferior treatment regimen, which claims and expenses Defendant would be responsible for administering and paying, Plaintiff conferred a benefit directly on Defendant.

135.    Defendant acknowledged, accepted, and retained the benefits so conferred from Plaintiff's providing such medical services to Patient as part of the Surgeries, because it allowed Defendant to fulfill its legal obligations to: (a) provide Patient with coverage for all stages of reconstruction in connection with Patient's mastectomies and for prostheses and physical complications thereof; and (b) ensure that its members, like and including Patient, have access to and receive medically necessary care without unreasonable delay or burden.

136.    Defendant has failed to pay the reasonable value of the benefit conferred upon it by Plaintiff, in this case, the reasonable value of the services provided to Patient as part of the Surgeries.

137.    By refusing to pay Plaintiff appropriately, Defendant has been unjustly enriched.

138.    The circumstances are such that it would be unjust and inequitable for Defendant to retain the direct benefit conferred on it by Plaintiff without paying the fair market or reasonable value of same.

139.    Plaintiff seeks compensatory damages, as permitted by applicable law, in an amount equal to the difference between the amounts Defendant paid to Plaintiff for the Claims and the fair market or reasonable value of the medical services underlying the Claims, plus interest.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the claims at issue and the fair market or reasonable of the medical services underlying

those claims, as determined by the finder of fact, together with an award of all applicable interest,

costs, and such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues so triable.

DATED:          September 28, 2022.
                Boca Raton, FL

                                    Respectfully submitted,

                                    **SHAPIRO, BLASI, WASSERMAN &**
                                    **HERMANN, P.A.**
                                    *Attorneys for Plaintiff*
                                    7777 Glades Road, Suite 400
                                    Boca Raton, Florida 33434
                                    Telephone:     561-477-7800
                                    Facsimile:     561-477-7722

                                    By:    */s/ Genevieve Lee Turner*
                                           RICHARD P. HERMANN, II, ESQ
                                           Florida Bar No. 110019
                                           Primary E-mail: rhermann@sbwh.law
                                           Secondary E-mail: floridaservice@sbwh.law
                                           GENEVIEVE LEE TURNER, ESQ.
                                           Florida Bar No. 100058
                                           Primary E-mail: gturner@sbwh.law
                                           Secondary E-mail: ksandoval@sbwh.law
                                           CHARLES BLAKE DYE, ESQ.
                                           Florida Bar No. 500461
                                           Primary E-mail:  bdye@sbwh.law